```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
                                                                    :
NAFTALI E. AUSCH,                                                   :   Civ. No. 17-CV-02949-FB-PK
                            Plaintiff,                              :
                                                                    :
            — against —                                             :   **FIRST AMENDED COMPLAINT**
                                                                    :
U.S. DEPARTMENT OF JUSTICE, JEFF SESSIONS,                          :   <u>**JURY TRIAL DEMANDED**</u>
in his official capacity as Attorney General of the United          :
States, FEDERAL BUREAU OF PRISONS,                                  :
METROPOLITAN DETENTION CENTER,                                      :
                                                                    :
                            Defendants.                             :
------------------------------------------------------------------- x
```

Plaintiff, Naftali E. Ausch ("*Rabbi Ausch*" or *"Plaintiff"*), by his attorneys, Sack & Sack, LLP, as and for his First Amended Complaint against the U.S. DEPARTMENT OF JUSTICE ("DOJ"), JEFF SESSIONS, in his official capacity as Attorney General of the United States, FEDERAL BUREAU OF PRISONS ("*BOP*"), the METROPOLITAN DETENTION CENTER ("*MDC*") (collectively, the "*Defendants*"*)*, alleges as follows:

### <u>NATURE OF THE ACTION</u>

1.     Plaintiff complains that Defendants engaged in the unlawful discrimination of Plaintiff and subsequent retaliation in the terms, conditions, and privileges of his employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, ("*Title VII*") based upon his religion, Judaism.

2.     Plaintiff files this action to seek monetary relief for the denial of equal employment opportunity and for the unlawful employment practices of Defendants.

3.     Plaintiff further complains that he has suffered, is suffering and will continue to suffer severe economic and non-economic damages because Defendants deprived Plaintiff

1

of his employment rights in violation of federal, state and city law.

4. Plaintiff exhausted all administrative remedies prior to timely filing this Complaint.

5. Any and all prerequisites to the filing of this suit have been met.

**PARTIES**

6. Plaintiff is an individual who, at all times relevant to this Complaint, has resided at 140 Ross Street, Brooklyn, New York 11211.

7. At all times relevant herein, Plaintiff was an "employee" within the meaning of 42 U.S.C.A. §§ 2000e, et seq. and is thus afforded protection against religious discrimination and retaliation in employment on the basis of his religion, Judaism.

8. Defendant DOJ is an agency of the United States.

9. Defendant Jefferson B. Sessions is the Attorney General of the United States (the "AG") and the head of the Department of Justice, which runs the BOP. The AG maintains offices located at U.S. Department of Justice 950 Pennsylvania Avenue NW Washington, DC 20530. Defendant Sessions is sued in his official capacity only

10. Defendant BOP is a federal law enforcement agency, and a subdivision of the DOJ, located at 150 Park Row, New York, New York 10007.

11. Defendant MDC is a federal administrative detention facility operated by BOP, a subdivision of the U.S. Department of Justice, located at 80 29th Street, Brooklyn, New York 11232.

12. During all relevant times, Defendants were Plaintiff's "employer" within the meaning of Section 701(f) of Title VII (42 U.S.C. § 2000e(f)).

## JURISDICTION AND VENUE

13. This Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 1343, respectively.

14. This court has jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), because the state law claims arise from a common nucleus of operative facts with the federal claims and are so related to Plaintiff's federal claims that they form a part of the same case or controversy between the parties under Article III of the United States Constitution.

15. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b)-(c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Eastern District of New York.

## FACTUAL ALLEGATIONS[1]

16. In or around June 2009, Ausch – a Rabbi who is a certified Chaplain and Orthodox Jew – commenced employment at the Metropolitan Detention Center in Brooklyn, New York as a Jewish Chaplain, GL-12, with the Federal Bureau of Prisons.

17. As a Chaplain, Rabbi Ausch provided counseling, spiritual guidance and other services on behalf of the inmates within the MDC.

18. Rabbi Ausch's immediate supervisor was Chaplain Father David Barry ("*Father Barry*"), his second line supervisor was Associate Warden David Ortiz ("*Ortiz*") and his third line supervisor was Warden Frank Strada ("*Strada*").

19. When Rabbi Ausch commenced employment with Defendants, Defendants accommodated his work schedule to allow him to fully practice his religion, Judaism.

---

[1] All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

3

20. Rabbi Ausch, an Orthodox Jew, among others things, is required by Jewish Law to attend morning prayer services after sunrise and before going to work. Furthermore, he is prohibited from working on Saturday, the Jewish Sabbath, and on Jewish religious observant days.

21. Accordingly, prior to December 2012, Defendants set Rabbi Ausch's work schedule for Monday through Friday, from 9:00AM to 5:00PM, thereby accommodating his religious observance to attend morning prayer services, and to conclude the workweek prior to the Jewish Sabbath.

**Rabbi Ausch's Discriminatory Schedule Change**

22. On or about December 27, 2012, Rabbi Ausch sent an email to Father Barry requesting an accommodation concerning religious services scheduled to take place on the Jewish holiday of Purim, which fell on that year on Sunday, February 24, 2013.

23. Since the very beginning of Rabbi Ausch's employment, Father Barry always gave Rabbi Ausch a difficult time about accommodating his religion.

24. This time, Father Barry, lost his temper. When Rabbi Ausch explained to Father Barry that he was not scheduled in any case to work on Sundays, Father Barry sought to "fix that" and engaged in discriminatory and retaliatory conduct against Rabbi Ausch.

25. In retaliation of Rabbi Ausch's requests concerning religious accommodations, Father Barry immediately revised Rabbi's Ausch's work schedule to discriminate against him based upon his religion.

26. Specifically, and with full knowledge and awareness of the religious circumstances that determine Rabbi Ausch's work schedule, Father Barry changed Rabbi Ausch's schedule from Monday-Friday to Sunday-Thursday, specifically to cause Rabbi

Ausch to be scheduled to work on the Purim holiday.

27. Father Barry further changed Rabbi Ausch's schedule to require him to report to work at 7:30AM or 8:00AM, thereby interfering with his morning prayers.

28. Father Barry had a history of subjecting Rabbi Ausch, as well as other Jewish inmates and Chaplains, to discriminatory, humiliating, derogatory, degrading, unwelcome, behavior, jokes, innuendo, remarks, comments, and discussions with others at MDC.

29. As Rabbi's Ausch's first line supervisor, Father Barry was well aware that Rabbi Ausch could not report to work at 7:30AM or 8:00AM, because he is required to pray during that time.

30. Father Barry was also aware that: (1) the MDC did not hold Jewish Services on Sundays; (2) Rabbi Ausch used Sundays in order to hold his weekly scheduled lectures, which he needed to conduct in order to maintain his certification as a Chaplain; and (3) that one or more Jewish holidays fell on a Sunday which created a conflict, as Jewish Law requires that Rabbi Ausch not work on these days.

31. It was also readily apparent that Father Barry possessed a discriminatory animus against those who practiced Judaism.

32. Indeed, following the immediate schedule change made by Father Barry that caused Rabbi Ausch to be scheduled on Purim, Rabbi Ausch explained that it was his holiday, making it difficult to work. Father Barry sarcastically replied, **"I'm sure your god will forgive you. He is a forgiving god."**

33. Father Barry often made derogatory remarks to the Jewish inmates and other Chaplains in front of Rabbi Ausch, and when Rabbi Ausch was not present. These comments were perceived by Ausch, as well as his fellow Chaplains, to be anti-semetic.

5

34. In particular, Rabbi Elimelech Weiss ("*Weiss*"), a volunteer at MDC and colleague of Rabbi Ausch, witnessed Father Barry's degradation of Rabbi Ausch and his intolerance of Jews.

35. For example, on Yom Kippur, one of holiest days on the Jewish calendar, when Rabbi Weiss made additional efforts to perform special services for the inmates, Father Barry would mock these efforts. Specifically, Father Berry commented, **"Why doesn't Rabbi Ausch do this?"**

36. Sometimes, when Rabbi Weiss would coincidentally run into Father Barry on a Friday at the MDC, Father Barry would negatively comment about the Jewish lecture Rabbi Weiss had given.

37. On other occasions, when Rabbi Weiss approached Father Barry about recruiting more volunteers for Jewish worship and activities within the prison, Father Barry commented, **"First let [Rabbi Ausch] do some work here… he appears to be lazy…"**

38. It is important to note that pursuant to the policies and procedures governing Chaplains at the Bureau of Prisons, Chaplains are not required to be present on the days they are not scheduled to work simply because religious prayers are required that day.

39. Father Barry also showed his discontent for Jewish Holidays, and Rabbi Ausch's religious freedom (and right to accommodation) to observe these holidays.

40. On or about September 28, 2012, two (2) days prior to the beginning of Sukkot, a weeklong Jewish harvest festival and holiday, a routine staff meeting was convened.

41. During this meeting, Father Barry fervently proposed that Rabbi Ausch work

6

on Sukkot.

42. Indeed, Father Barry was hostile towards Rabbi Ausch's observance of the holiday of Sukkot, and Rabbi Ausch's right to freely observe this holiday, stating, **"I hope it rains all the Sukkah holiday."** This statement was confirmed by Imam Ahmed Musah, another Chaplain of MDC.

43. When making the comment, Father Barry was aware that it is considered a bad omen when it rains on the Sukkot holiday where observance is conducted mostly outdoors.

44. In or around October 2012, while the Sukkah stood erect at the MDC, Father Barry discarded the box the Sukkah is stored in year-round.

45. These episodes occurred weeks prior to Father Barry's changing Rabbi Ausch's schedule in retaliation for his request for religious accommodation.

46. Father Barry also had a reputation at MDC for being intolerant of the Jewish inmates. Specifically, Father Barry held little regard for the traditions surrounding Jewish worshiping practices.

47. One on particular occasion, on or about Friday, December 14, 2012, Father Barry picked up the Jewish inmates to light Chanukah candles at 4:00PM even thought it was scheduled for 4:00PM so that the lights would be extinguished prior to sundown, therby obviating the ceremony in the first place.

48. Father Barry knew of the significance and timing associated with Jewish prayer, and disregarded it so as to interfere with the Inmates' religious practices and tradition.

49. Indeed, this sort of behavior was commonplace for Father Barry, who when given the opportunity, did all he could to interfere with Jewish worship at MDC.

50. Accordingly, Father Barry's decision to change Rabbi Ausch's schedule was

not coincidental, but rather a decision made for the purposes of discriminating against Rabbi Ausch on the basis of his religion.

51. Concerned about this new schedule change, and specifically, the impact it would have on his ability to practice his religion, Rabbi Ausch asked Father Barry to change his schedule to reflect the days and hours during which he previously worked.

52. Rabbi Ausch also explained that he could not, under any circumstance, work at the time proscribed by new schedule because it directly conflicted with his ability to pray, a cornerstone of his religious practice that he participated in every day.

53. Notwithstanding Rabbi Ausch's attempt to discuss these issues with Father Barry, Father Barry vehemently opposed Rabbi Ausch's request and refused to make *any* alterations to his schedule.

54. At one particular meeting during which Rabbi Ausch further discussed the new schedule change with Father Barry, Father Barry stated, **"I do not care if you lose your certification."**

55. Instead of accommodating his religious practices, and in unlawful retaliation for Rabbi Ausch raising his good-faith complaints of religious discrimination about his new work schedule, Father Barry intentionally and with a discriminatory motive referred, by himself or through Warden Strada, Rabbi Ausch to the Office of Internal Affairs ("*OIA*") for an internal investigation for not complying with his command and for being "AWOL" on a religious holiday. The OIA typically investigates felony crimes and high level criminal activity.

56. Indeed, Rabbi Ausch was treated differently than other Chaplains because of his religion, and would not have been referred to the OIS investigation but for Father Barry's

8

discriminatory animus towards the Jewish religion, and his practicing thereof.

57. Father Barry, who was solely responsible for preparing a schedule that would accommodate Rabbi Ausch religious practices (and the practices of the other Chaplains as well), and had the unilateral authority to change work schedules, made the calculated decision to alter Rabbi Ausch's schedule to interfere with his religious practices based upon discriminatory animus.

58. While supervisors, like Father Barry, are required to prepare a schedule that considers and facilitates the needs of the BOP and MDC, Father Barry's changing Rabbi Ausch's schedule was entirely discriminatory and any other reason offered by Defendants is entirely pretextual.

59. This is especially true given Father Barry's past conduct, and the discriminatory animus directed at Jewish employees, specifically Rabbi Ausch, and inmates at the MDC.

60. When Rabbi Ausch was out of the office in observance for his religious holidays, he was written up and progressively disciplined with suspensions and pay docks.

61. Rabbi Ausch was illegitimately placed on AWOL and referred to an OIS investigation in retaliation for elevating complaints to his first line supervisor, Father Barry, concerning his the change of schedule on the basis of his religion.

62. On July 31, 2013, Rabbi Ausch filed his first complaint with the Department of Justice ("*DOJ*") alleging religious discrimination and retaliation.

63. Thereafter, the discrimination against Rabbi Ausch and the subsequent retaliation snowballed into further discriminatory actions by Rabbi Ausch's supervisors against Rabbi Ausch concerning Defendants' continued refusal to accommodate Rabbi

Ausch's religious observance.

64. Marcus Branch, who was Father Barry's successor, carried Father Barry's torch of discrimination against Rabbi Ausch using Father Barry's original discriminatory actions to carry on Father Barry's discipline and religious harassment against Rabbi Ausch.

65. It is documented how Mr. Branch refused to reasonably accommodate Rabbi Ausch's religious observance and held Rabbi Ausch to a higher standard (*i.e.*, was less tolerant) of otherwise minor policy infractions and disciplined and harassed Rabbi Ausch accordingly in retaliation thereof.

66. As a consequence, Rabbi Ausch continued to suffer discrimination and retaliation based upon his religion.

67. Similarly, Rabbi Ausch continued to be retaliation against he continued to complain to the DOJ's EEO offices, to no avail.

68. Subsequently, and as a consequence of elevating these complaints, Defendants discriminated against Rabbi Ausch in respect of the terms, privileges and conditions of his employment, ultimately resulting in his discriminatory and retaliatory termination.

69. There is no legitimate business justification for such targeting and persecution of Rabbi Ausch to exist at MDC by his supervisor and others on the basis of his religion. Such discriminatory behavior did not further the business of Defendants.

70. To date, Defendants have not been able to articulate legitimate reasons for discriminating and retaliating against Rabbi Ausch based on his religion.

71. Any purported non-discriminatory, legitimate justification proffered by Defendants concerning Rabbi Ausch's discrimination and retaliation is pretextual.

## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims against Defendants:

## COUNT ONE
### (Religious Discrimination – Title VII)

72. Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

73. Defendants discriminated against Plaintiff in terms of conditions of his employment on the basis of his religion, in violation of Section 703(a)(2) of Title VII (42 U.S.C. § 2000e-2(a)(2)).

74. As a result of the Defendants' wrongful actions complained of herein, Plaintiff has suffered monetary damages and damages for mental anguish in the form of humiliation, embarrassment, emotional distress, physical injury, and other incidental and consequential damages and expenses.

75. As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendants, in addition to all other amounts sought herein.

## COUNT TWO
### (Retaliation – Title VII)

76. Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

77. Defendants have retaliated against Plaintiff for having complained of religious discrimination in the terms and conditions of employment in violation of Section 704 of Title VII (42 U.S.C. § 2000e-3).

78. Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of religious discrimination to Defendants and appropriate authorities, including the EEO.

79. Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of religious discrimination to Defendants and appropriate authorities, including EEO.

80. As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of religious discrimination to Defendants and appropriate authorities, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating him employment.

81. As a result of the Defendants' wrongful actions complained of herein. Plaintiff has suffered monetary damages and damages for mental anguish in the form of humiliation, embarrassment, emotional distress and physical injury.

## COUNT THREE
### (Hostile Work Environment – Title VII)

82. Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

83. Defendants created a work environment that was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

84. These employment practices violate § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

85. As a result of the Defendants' wrongful actions complained of herein, Plaintiff has suffered monetary damages and damages for mental anguish in the form of humiliation,

embarrassment, emotional distress and physical injury.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I. Judgment declaring that the acts complained of herein violate the rights of Plaintiff as guaranteed by federal, state, and city law prohibiting discrimination;

II. Enjoining Defendants from any further acts exposing Plaintiff to discrimination and adversely affecting the terms and conditions of Plaintiff's employment;

III. Judgment directing Defendant to reimburse and make Plaintiff whole for any and all earnings he would have received but for Defendants' discriminatory treatment and unlawful dismissal, including but not limited to, back pay, double back pay, contractual damages and pension benefits;

IV. Judgment awarding Plaintiff compensatory damages for mental anguish, loss of dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to be determined at trial, including reasonable attorneys' fees, as provided under applicable law.

V. Judgment awarding Plaintiff punitive damages;

VI. Judgment awarding prejudgment interest, costs and statutory attorney' fees; and

VII. Such other and further relief that the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

Dated: New York, New York
December 12, 2017

Respectfully submitted,

**SACK & SACK, LLP**

By /s/ Eric R. Stern
Eric R. Stern, Esq.

**Attorneys for Plaintiff**
70 East 55th Street, 10th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702