UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
NAFTALI E. AUSCH,

**MEMORANDUM AND ORDER**

        Plaintiff,

    -against-

Case No. 17-cv-2949

MERRICK GARLAND, Attorney
General of the United States,

        Defendants.
-----------------------------------------------x

*Appearances:*
*For the Plaintiff*:
ERIC R. STERN
Stern Law Group
45 Broadway, 30th Floor
New York, New York 10006

*For Defendant:*
BREON PEACE
United States Attorney
Eastern District of New York
SHANA C. PRIORE
Assistant United States Attorney
271 Cadman Plaza East, 7th Floor
Brooklyn, New York 11201

**BLOCK, Senior District Judge:**

      Defendant Merrick Garland (the "DOJ" or the "Defendant") moves for an

order granting summary judgment against Plaintiff Naftali E. Ausch ("Rabbi Ausch"

or "Plaintiff") and dismissing all claims. Plaintiff opposes the motion. For the

following reasons, Defendant's motion is granted.

## I.   BACKGROUND

      The following facts are taken from the pleadings, the parties' Rule 56.1

statements, and supporting documentation. They are undisputed unless otherwise

1

noted.

Plaintiff Naftali Ausch is an Orthodox Jewish chaplain. Between 2009 and 2015, he was employed at the Metropolitan Detention Center ("MDC") in Brooklyn, New York, which is operated by the Bureau of Prisons ("BOP"). During his tenure, he was the only Jewish chaplain on staff. At all relevant times, the staff consisted of three to five chaplains.

The BOP's Program Statement 3939.07, "Chaplain's Employment, Responsibilities, and Endorsements," requires chaplains to "work on their weekly day of religious observance," "lead the religious service regularly," and "work on the seasonal holy days of their faith tradition." Chaplains also must "share pastoral duties, supervision of inmate groups, and administrative functions equitably." Program Statement 3420.11, "Standards of Employee Conduct," requires that employees "obey the orders of their supervisor" and "cooperate fully" with official investigations. DOJ Order 1630.1b provides leave procedures, including Absence Without Leave ("AWOL") charges, sick leave, religious observance, and pay forfeiture. Employees are required to submit leave through a formal process in advance of their days off. Supporting medical documentation may be requested before sick leave is granted. Rabbi Ausch was informed of these policies when he began work at the MDC.

Rabbi Ausch was not scheduled to work on the Sabbath—sunset on Friday to

sunset on Saturday. He asserts that the hiring chaplain knew of his work restrictions and hired him anyway. There is no written evidence of this understanding.

Father David Barry ("Father Barry") was Rabbi Ausch's supervising chaplain between 2011 and 2013. Father Marcus Branch ("Father Branch") was his supervising chaplain from September 2014 to February 2015. David Ortiz was the associate warden ("AW Ortiz") from 2011 to 2013. Warden Frank Strada ("Warden Strada") was hired in July 2012. Kimberly Ask-Carlson ("Warden Ask-Carlson") was warden from February 2014 to February 2015.

### a. Sukkot 2012

In 2012, Rabbi Ausch was scheduled to work Monday through Friday with Saturday and Sunday off. Between July 15 and August 31, 2012, he was absent without excuse at least five times on days that preceded or followed his days off. On September 21, 2012, Father Barry informed Rabbi Ausch that his absences "negatively impacted departmental operations and resulted in reduced work productivity" and reminded him of the proper leave policies and consequences. Declaration of Shana C. Priore ("Priore Dec."), Exhibit C at 29. In response, on September 23, 2012, Rabbi Ausch emailed Father Barry: "Would it be not better if we work together not hurting any one[.] Because this is what BOP wants and GOD as well. Why hit me up faulsly [sic] and more so during my Holiest days when we are all busy repenting and working towards a better life." Declaration of Naftali E.

Ausch ("Ausch Dec."), Exhibit B. On September 25, 2012, at 9:16 am, Warden Strada emailed Father Barry: "It is my expectation…that you have coverage to accommodate religious events, escorts for volunteers of various faiths. You…must anticipate the needs of these events and schedule your staff accordingly. It is not the responsibility of the correctional officers to replace religious services staff to ensure religious functions are met." Ausch Dec., Ex. C. At 9:29 am, Rabbi Ausch emailed Warden Strada that "Barry is giving me hell I am almost breaking down." *Id.* Warden Strada responded, "I don't understand?" Rabbi Ausch states, "The other day I asked you I need some time to talk to you this was one it, I have very big problems with him, from my past experience he comes in the last minuet tries to destroy it and wants to run away from it. And from day to day he is been on a mission to hurt me whenever and with whatever he can, after the Holidays I tell you more." *Id.* at 31 (transcribed as written). Strada responded, "ok, see me after the holidays." *Id.* It is unclear if there was a follow up before the 2013 EEOC complaint.

Later that day, Father Barry scheduled an "urgent" department meeting for Friday, September 28 to discuss scheduling for Sukkot, the following week. Rabbi Ausch alleges the email was purposefully sent after sunset on Yom Kippur so that he would not know of the meeting until 25 hours later. The Sukkot schedule required Rabbi Ausch to work the first days of Sukkot, October 1 and 2, which fell on his regularly scheduled days. Rabbi Ausch objected to working on the first two days of

the week-long holiday and explained that his presence was not necessary because no specific ritual was required. He further explained that the holiday would involve the inmates eating inside a Sukkah, but if it rained, they would not be required to do so. He alleges that Father Barry responded, "I hope it rains the whole Sukkot holiday." Priore Dec., Ex. B at 39. Plaintiff alleges this statement was blasphemous.

Plaintiff also alleges that during the holiday Father Barry discarded the box that holds the Sukkah, which Father Barry denies.

### b. Chanukah 2012

On Friday, December 14, 2012, the Jewish inmates were scheduled to observe the lighting of the candles. Rabbi Ausch had left before the ceremony and left instructions for Father Barry to assemble the Jewish inmates at 4:00 pm. Father Barry assembled them early at 2:00 pm. Rabbi Ausch alleges that Father Barry purposefully did so in order to ruin the religious significance of the ceremony. While Father Barry averred that he corrected the mistake and the ceremony occurred as scheduled, Rabbi Ausch alleges that the ceremony never happened that day.

### c. Purim 2013

On December 27, 2012, Rabbi Ausch emailed Father Barry about service requirements for Purim on February 24, 2013. He planned to have two volunteers perform the services on Saturday and Sunday and requested "help from the chaplains to staff it." Priore Dec., Ex. C at 157. Purim fell on a Sunday, which at the time was

Rabbi Ausch's regular day off. He did not make a formal request for time off. However, Father Barry scheduled Rabbi Ausch to work on Purim. The new schedule was memorialized on December 31, 2012 in a memo from Chaplain Seth Costello. Priore Dec., Ex. C at 158-59 ("Jewish Purim Services will be supervised by Imam Musah & Rabbi Ausch."). At some point, Rabbi Ausch requested not to work on Purim or on the High Holy Days, to which Father Barry allegedly responded sarcastically, "I'm sure your god will forgive you. He is a forgiving god." Priore Dec., Ex B at 68.

On Purim, February 24, 2013, Plaintiff was scheduled to work from 8:00 am to 4:00 pm. He arrived at 11:45 am and left two hours later. He did not notify management of his absence or tardiness.

### d. The Volunteer Rabbis

The two Rabbis that volunteered for Purim services reported to the Warden comments by Father Barry that they deemed offensive. On February 28, 2013, Rabbi Joel Weiser reported he was "surprised and shocked at the behavior of Father Barry, and the way he dislikes Rabbi Ausch bad mouthing him as not doing his work and so on...[I] do not wish to he [sic] a derogatory comments [sic] at anyone and especially against this overworked Chaplain Ausch." Priore Dec., Ex. C at 36.

On March 4, 2013, Rabbi Elimelech Weiss emailed Warden Strada about Father Barry, who "displays open discontent towards the revered and hardworking

chaplain Rabbi Ausch." *Id.* at 34. Rabbi Weiss reported that he asked for help recruiting more volunteers and Father Barry replied, "First let the rabbi do some work here. He appears to be lazy." *Id.* On an occasion when Rabbi Weiss mentioned giving a lecture to the inmates about the Sabbath, Father Barry responded, "Tell me why doesn't Rabbi Ausch do this? What DOES he do all day long?" *Id.* On Yom Kippur, Rabbi Weiss stayed at a nearby hotel and left his family to hold a service for the inmates. In response, Father Barry remarked, "why doesn't Rabbi Ausch do this?" Rabbi Weiss found these comments to be inappropriate and disrespectful, felt "degraded" and "thought they were degrading to his religion a well." *Id.*

Father Barry has admitted to making remarks regarding Rabbi Ausch's work ethic—that he is over paid, does not do his work, and would rely on volunteers to do his work if he could—but says they were not based on dislike of the Jewish faith or tradition, or personal dislike of Rabbi Ausch.

### e. Winter 2013 Schedule

In late December 2012, Father Barry changed Rabbi Ausch's schedule to Sunday through Thursday. He explained that the changes were to accommodate departmental needs. On Sundays, the chaplains had to escort Christian volunteers and inmates, and Father Barry also had to conduct religious services. Rabbi Ausch alleges that the change was not communicated until January 18, 2013 and was made in retaliation against him for requesting time off on Purim.

Rabbi Ausch complained that his new Sunday start time—7:30 am—conflicted with his morning prayers and prevented him from holding his weekly lectures, which he needed to maintain his certification as a chaplain.[1] He alleges that Father Barry refused to change his schedule and responded, "This is what I want," and "I do not care if you lose your certification." Priore Dec., Ex. B at 91.

Rabbi Ausch ignored the new work schedule. On Friday, February 1, 2013, he showed up on a day he was not scheduled to work. He was instructed to leave and refused, stating that the schedule was "not good for him" and he "would make his own schedule and follow it." Priore Dec., Ex. C at 129. One week later, on February 8, he was referred to the Office of Internal Affairs. As mentioned above, Rabbi Ausch did not adhere to his schedule on Purim and was placed on AWOL status by Warden Strada for the six hours he was not at work.[2] By at least February 19, 2013, Rabbi Ausch's start time was changed to allow for his morning prayers.[3] Priore Dec., Ex. C at 127-28.

On April 1, 2013, Rabbi Ausch filed an employment discrimination complaint

---

[1] The chaplain certification was not part of Father Barry's practice of religion. His testimony makes clear that the Sunday time was preferred rather than mandatory.

[2] Rabbi Ausch insists that he informed Father Barry ahead of time that he would not be there, pointing to an email he sent to Father Barry on February 21, 2013. Ausch Dec., Ex. M ("Dear Fr. Would the Sunday reading of the megila be ok it [sic] done at 11AM the volunteers want to do it and leave for their time, Please let me know."). That email is neither a formal leave request, nor a clear indication that he would be absent.

[3] Plaintiff cites to an email with Chaplain Heidi Kugler, Assistant Chaplaincy Administrator, to demonstrate his requests that the Sunday work schedule be changed. However, this email is dated December 23, 2014, nearly two years after the initial schedule change. Ausch Dec., Ex. I.

against BOP stating that he was subjected to religious discrimination when (i) in January 2013, Father Barry changed his schedule, and (ii) in February 2013, Warden Strada reported him to OIA for refusing to comply with the schedule. On May 14, 2013, BOP accepted the complaint for investigation.

### f. Rabbi Ausch's Suspensions

On May 23, 2013, a department meeting was held where each staff member was instructed to work their assigned hours. Rabbi Ausch was informed that his work schedule was Sunday through Thursday, with Friday and Saturday off. Priore Dec., Ex. U. On May 26, 2013, he was reminded that schedule adjustments must be authorized by his supervisor. *Id.* On June 9, 2013, Rabbi Ausch again failed to report to work without requesting leave or notifying his supervisor. He was again marked AWOL. *Id.*

On June 26, 2013, Rabbi Ausch emailed Jermaine Wilkins, Acting Religious Services Supervisor, about a religious fast and stated, "Volunteers that are added to my faith just to satisfy numbers is a lie." Ausch Dec., Ex. N. Later that day, Wilkins responded:

> [Y]ou are not authorized to dictate who can volunteer for the Religious Services department. Volunteers are just that "volunteers", and may do so at their leisure. So long as they maintain and [sic] active role in the Religious Services Mission, we succeed as a department. Again, no religion belongs to any one individual. Just because you practice a religion doesn't mean you own it. Any inmate can elect to practice any specific faith, and as "Chaplains" in the Federal Bureau [of] Prisons you are to encouraged [sic] to ensure proper practice of an elected faith.

9

> We cannot judge anyone based on race, color, ethnic background, or sex; nor can we denounce them as members of a specific faith group without proper provocation. Since you have presented no validity to your claims, this discussion is over. Chaplains are expected to serve the entire inmate population not one specific group.

*Id.* On July 17, 2013, Rabbi Ausch was informed that he had been recommended for a 14-day suspension in accordance with the BOP's Standard Schedule of Disciplinary Offenses, for (i) refusing to leave the premises on February 1, (ii) AWOL status on February 24, 2013, and (iii) failure to follow leave procedures for his absence. Priore Dec., Ex. K. On January 15, 2014, Deputy Regional Director Herman Quay informed Rabbi Ausch that he would be suspended for 10 days from January 19 to January 29, 2014. Priore Dec., Ex. L.

On December 26, 2013, he was again recommended for a 14-day suspension for his AWOL charges, failure to follow leave procedures, and failure to exercise sound correctional judgment. Priore Dec., Ex. P. On Feb 20, 2014, Rabbi Ausch was notified that his suspension would take place from March 9 to March 22, 2014.

On June 24, 2014, he notified Father Branch via email that he would not be able to work on seven separate dates: Rosha Hashana, September 25, 2014; Sukkoth, October 9 and 16, 2014; Purim, March 5, 2015; Passover, April 4, 2015; and Shouvot, May 24 and 25, 2015.

On September 22, 2014, Plaintiff submitted formal leave requests for September 25, October 8 and 9, and October 15 and 16. Father Branch approved

September 25 and October 15 and 16, but not October 8 and 9. Priore Dec., Ex. M. On October 1, 2014, Rabbi Ausch insisted on having the days off, and Father Branch reminded him that he needed to send formal leave requests and explained that two other chaplains were on leave that week, so Ausch's request could not be granted. Rabbi Ausch did not show up for work on October 8 and 9 and did not notify his supervisor that he would not be coming. On October 9, Father Branch notified Rabbi Ausch of his AWOL status for October 8 and 9.

### g. Sick Leave

On October 14, 2014, Father Branch notified Rabbi Ausch that he had used 120 hours of sick leave between April and October 2014 in conjunction with his regularly scheduled days off and would now need to provide medical documentation substantiating any future sick leave requests. On December 28, 2014, Rabbi Ausch called out sick and refused to provide documentation, because it was "against the BOP law." Priore Dec., Ex. C. at 401. Again, he was placed on AWOL status. *Id.* at 402. Plaintiff produced a letter dated January 9, 2015 from his doctor's office stating he had several medical conditions. It did not address his ability to work on any specific day.

On March 10, 2015, Father Branch issued a memo regarding Rabbi Ausch's AWOL status on January 26 and 27 for sick leave. Priore Dec., Ex. C at 406. On that occasion, he did call and inform Father Branch that he would not be coming in.

Father Branch requested documentation, and Rabbi Ausch did not provide any. He was placed on AWOL status for both days.

### h. Violating BOP Policies

Between January and July 2014, Rabbi Ausch took personal calls on his cellphone from inmates. During his suspension in March 2014, Rabbi Ausch brought tefillin to an inmate without prior authorization for the visit. Bringing "contraband" into MDC and having an unauthorized visit with an inmate are grounds for disciplinary action. A memo dated March 13, 2014 states that visiting the building while on suspension, specifically to visit "a newly admitted inmate who arrived three days before is a service that is not authorized in the performance of Ausch's duties." Priore Dec., Ex. Q at 58. In addition, "foreknowledge of the inmate arrival and visiting with him is outside the normal operation of the institution chaplain and is deemed preferential treatment that is not afforded all inmates upon their arrival into the institution." *Id.*

In June 2014, the Office of the Inspector General initiated an investigation of Plaintiff, and he refused to participate. On October 2, 2014, an investigation memo found that "allegations regarding Introduction of Contraband; Preferential Treatment of Inmates' and Failure to Follow Policy all seem sustainable under the Standards of Employee Conduct;" that telephone records sustained a violation of improper contact with an inmate/inmate's family; and that his refusal to answer

questions after being compelled sustained a violation for refusing to cooperate with an investigation. Ausch Dec., Ex. Q. However, "there is no BOP policy that prevents an employee from entering the institution while on suspension. Therefore, Ausch entering the MDC Brooklyn while on suspension does not violate policy." *Id.*

On December 19, 2014, Rabbi Ausch filed a second administrative complaint for discrimination against BOP for harassment due to his schedule change, placement on AWOL, being required to produce documentation for sick leave, and his limited access to the institution between September 2014 to January 2015. Priore Dec., Ex. C at 210. On February 3, 2015, the second amended complaint was accepted for investigation. Priore Dec., Ex. T at 6-7. On February 14, 2017, DOJ determined that no discrimination had occurred. *Id.*

In January 2015, Warden Ask-Carlson ordered the change of Plaintiff's schedule and the limitation of his access to the MDC while under investigation for violating security procedures. The Warden sent an email blast with Rabbi Ausch's photograph indicating that he was not authorized access to the building. Rabbi Ausch alleges this was retaliation after the investigation found that there was no policy prohibiting him from entering the institution while on suspension. On January 7, 2015, an MDC union rep requested the email be retracted as a violation of Rabbi Ausch's privacy.[4]

---

[4] "I have not seen a 'limited Institution Access' memo sent to an open E-mail box (Bro-Lobby)

In June 2015, Rabbi Ausch was denied a within-grade pay increase based on a "minimum satisfactory" rating. Priore Dec., Ex. R. His mid-year review stated: "It is essential that chaplains maintain a close tie with their faith group, however, Chaplain Ausch should be mindful that his personal beliefs and practices should not infringe on inmates from practicing their faith;" "Chaplain Ausch needs to spend more time in the units and less time in the office;" "Chaplain Ausch in the next half of the year needs to grasp the idea of facilitating the religious needs of others." Priore Dec., Ex. S.

On August 3, 2015, Associate Warden Hendrix proposed that Plaintiff be removed from his position due to an unauthorized visit with an inmate, bypassing security procedures, improper contact with inmates, and refusal to cooperate with the OIG investigation. On August 14, 2015, Plaintiff responded, but did not refute the facts. Priore Dec., Ex. Q. On October 28, 2015, BOP terminated Ausch's employment and memorialized the decision in a letter.

On February 16, 2016, Plaintiff filed a complaint with the Merit Systems Protection Board ("MSPB") challenging his removal, which was dismissed as untimely. Priore Dec., Ex. Q.

---

showing that an employee is under some kind of investigation or limited Access duty. This violates his Rights to privacy according to the Privacy act, 5 U.S.C., the Master Agreement Article 6(m). We request that Rabbi Ausch memorandum sent to the lobbies, Control Center and Visiting Rooms be retracted immediately and consideration for a more feasible assignment be discussed with the Union prior to implementation." Ausch Dec., Ex. R.

On May 15, 2017, Plaintiff filed a complaint in district court. On March 25, 2019, this Court dismissed claims of discriminatory and retaliatory termination for untimeliness.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Facts are "material" where their resolution might affect the outcome of the suit under the governing law. *Id.* On a motion for summary judgment, "all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (internal citation and quotation omitted). Once the moving party shows that there are no issues of fact that could affect the outcome, the burden then shifts to the non-moving party to show specific, admissible evidence of a genuine, material dispute. *See* Fed. R. Civ. P. §56(c); *Liberty Lobby, Inc.* at 248-49.

## III. DISCUSSION

In Title VII discrimination cases, "the question [on summary judgment is] . . . . whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough to disbelieve the employer; the

factfinder must also believe the plaintiff's explanation of intentional discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000), *cert. denied*, 540 U.S. 811, 124 S.Ct. 53 (2003) (quotations omitted). When a case turns on the intent of one party, a "trial court must be cautious about granting summary judgment." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir.1994).

Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981).

### a. Failure to Provide Religious Accommodation

Employers must make reasonable accommodation for an employee's religion unless doing so would constitute an undue hardship. 42 U.S.C. § 2000(e)(j). In order to establish a *prima facie* case for failure to accommodate his religion, plaintiff must show that: (1) he had a *bona fide* religious belief that conflicted with an employment requirement; (2) he informed the employer of this belief; and (3) he was subsequently disciplined for failure to comply with the conflicting employment requirement. *See Philbrook v. Ansonia Bd. Of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985).

If successful, "the employer then has the burden to show that it made good faith efforts to provide the employee with a reasonable accommodation." *Elmenayer v. ABF Freight Systems*, 2001 WL 1152815 (E.D.N.Y. 2001). "An accommodation is said to cause an undue hardship whenever it results in 'more than a de minimis

cost' to the employer." *Baker v. The Home Depot*, 445 F.3d 541, 548 (2d Cir. 2006) (citing *Trans World Airlines v. Hardison*, 432 U.S. 63, 84 (1977)). If an employer demonstrates that it reasonably accommodated an employee's religious needs, the statutory inquiry ends. *Baker*, 445 F.3d at 548.

Plaintiff has established his *prima facie* case. There is no dispute of the sincerity of his religious beliefs or of his supervisors' knowledge of them. He alleges that BOP failed to accommodate his religious needs when: 1) Father Barry denied his request for regularly scheduled Sundays off; 2) created a new schedule conflicting with his morning prayers; and 3) Father Branch denied his requests for leave on Jewish holidays. When Plaintiff was not granted leave, he simply did not show up to work and was subsequently placed on AWOL status, received several suspensions, and was subject to internal investigations.

Defendant argues that it made reasonable accommodations for Plaintiff's religious needs. As the record shows, he did not work on the Sabbath. He was never scheduled for Friday evenings or Saturdays. When his schedule was changed in early 2013, Plaintiff informed his supervisors that an early start time conflicted with his morning prayers, and his start time was moved to accommodate them. The requests for time off on Sundays to give weekly lectures did not require accommodation because the request was for a professional accommodation, not a religious one.

According to BOP policies, chaplains were expected to work on religious holidays and weekly days of worship. *See* P.S. 3939.07 (chaplains must "[w]ork on their weekly day of religious observance" and "on the seasonal holy days of their faith tradition."). However, the BOP had procedures in place for all requests for time off, including for religious observance. Plaintiff often failed to follow those procedures. But when he did, his requests were frequently granted. For example, in 2014, though he submitted formal leave requests on September 22, he was granted leave for September 25, October 15, and October 16. For the two days when leave was not approved, two other chaplains had already received approval for leave.

Having provided a procedure through which Rabbi Ausch could make requests for time off and granting time off when reasonable, Defendant has shown it made reasonable accommodations. The BOP did not need to provide exactly the remedy Plaintiff requested—seemingly, to make his own schedule—as such a remedy would have created "actual impositions" on other employees and the department. *See Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002) ("[T]he employer need not offer the accommodation the employee prefers."); *Craig v. City of New York*, No. CV044857BMCLB, 2007 WL 9712108, at *7 (E.D.N.Y. Sept. 7, 2007) (citing *Trans World Airlines v. Hardison*, 432 U.S. 63 (1977) ("The phrase '*de minimis* cost' entails not only monetary concerns, but the burdens employers bear in conducting their businesses, such as scheduling difficulties; loss of

efficiency; disruption of other employees' work routines; and injury to employee morale.").[5]

Plaintiff argues that Father Barry harbored animus against him, and the animus drove the administrative decisions. However, because the Court finds that the Defendant made good faith efforts to provide reasonable accommodations, the inquiry must end. *See Jamil v. Sessions*, No. 14CV2355PKCRLM, 2017 WL 913601, at *6 (E.D.N.Y. Mar. 6, 2017) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)) ("[T]he 'summary judgment rule would be rendered sterile. . .if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.'").

For the reasons above, Defendant is granted summary judgment on Plaintiff's claim for failure to accommodate.

### b. Retaliation

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge,

---

[5] *See also Jamil v. Sessions*, No. 14CV2355PKCRLM, 2017 WL 913601, at *10 (E.D.N.Y. Mar. 6, 2017) (citing *Elmenayer*, 2001 WL 1152815, at *5) ("While the employer bears the burden of making a reasonable accommodation for the religious beliefs of an employee, the employee, too, must make some effort to cooperate with an employer's attempt at accommodation." . . . "Where an employer has made a good faith effort to accommodate an employee's religious practices, courts in this circuit have not looked further to make a determination as to what precisely constitutes reasonableness.").

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

To state a *prima facie* claim for retaliation, Plaintiff must prove: (1) he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action. *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014). Then, the burden shifts to the defendant to show a "legitimate, non-retaliatory reason for the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal citations omitted).

Plaintiff must then "establish that retaliation was a 'but-for' cause of Defendant['s] adverse actions," which "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive," i.e., the wrongful action of the employer. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845-46 (2d Cir. 2013) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("[R]etaliation claims must be proved according to traditional principles of but-for causation.").

i. *Protected Activities*[6]

"Protected activity often takes the form of filing a lawsuit or formal complaint with an agency...[but] may also take the form of less formal protests, such as making complaints to management[.]" *Little v. NBC*, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002). Employee complaints may be protected activity where "(i) the employee had a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VII, and (ii) the employer understood, or could reasonably have understood, that the [employee's] opposition was directed at conduct prohibited by Title VII." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 247 (S.D.N.Y. 2021) (citing *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quotations omitted)).

Plaintiff argues that his complaints about not receiving time off for religious holidays were protected activity, as well as the September 25, 2012 email to Warden Strada, the December 27 email regarding staffing needs for Purim, and his EEO complaints. *See Little*, 210 F. Supp. 2d at 384.

Plaintiff's general complaints to his supervisors regarding time off as well as his EEO complaints are protected activities. However, while an informal complaint may be a protected activity, the September 25 email to Warden Strada and the

---

[6] Defendant argues that many of Plaintiff's protected activities are unexhausted and therefore should be dismissed. Because the conduct is temporally entangled and this issue is not dispositive, the Court will assume without finding that the allegations were exhausted.

December 27 Purim email do not meet the criteria. It is apparent that Rabbi Ausch intended to lodge a grievance with Warden Strada, but nothing in the email makes clear the basis of the complaint. *See Livingston*, 563 F. Supp. 3d at 247 (citing *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012)) ("[I]nformal complaints 'must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII.'"). And, there is nothing in the record to suggest that Father Barry was aware of the email when he changed Plaintiff's schedule. In addition, Plaintiff himself acknowledges he was not seeking an accommodation or special dispensation with the December 27 email, which he alleges prompted Father Barry to retaliate by scheduling him to work on Purim. *See* Ausch Mem. in Opp. to SJ at 8, n.3.

### ii. Adverse Employment Action

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (internal citation omitted). "A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, (2006)

(internal citations omitted). "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.*

Plaintiff identifies several actions as adverse or retaliatory, including scheduling an "urgent" meeting after sunset on September 25, the September 28 meeting, scheduling him to work on Sukkot 2012, discarding the Sukkah storage box, scheduling him to work on Purim in 2013, changing his schedule to include Sundays in 2013, placing him on AWOL status, and limiting his access to the building during his suspension.

Scheduling the September 28 meeting, the meeting itself, and the discarding of the Sukkah box are not as adverse employment actions. There is not sufficient evidence to show these actions were anything but ordinary workplace conduct. In contrast, because of the arguably religious context, the schedule changes, AWOL status, and limited building access are sufficient to support a *prime facie* claim. *White*, 548 U.S. at 69 ("Context matters….A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to [another].").

### iii. Causation

"[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who

engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (citing *Gordon v. N.Y. City Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

Plaintiff has not shown direct evidence of retaliatory animus, but his "reliance on temporal proximity may be sufficient to establish a *prima facie* case of retaliation." *Livingston*, 563 F. Supp. 3d at 248–49. His allegations of receiving disparate treatment are unsupported because Imam Musah and the Plaintiff were not similarly situated. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal *prima facie* case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to [the] plaintiff's…"). Though both were employed as chaplains, Plaintiff points to only one instance where Imam Musah was granted a schedule change or leave that he viewed as unfair. Further, there is no evidence on the record of Imam Musah's scheduling requests, specifically evidence of any demands for time off on specific days of the week, use of informal requests rather than BOP leave forms, failure to notify supervisors of schedule changes, frequent unexcused sick leave, or even whether he worked on Muslim holidays or the weekly day of worship.

However, because Plaintiff is only required to make a minimal showing to support his *prima facie* case, he has established causation between the protected activities and the adverse actions through temporal proximity. Therefore, Plaintiff has made a *prima facie* case for retaliation.

### iv. Defendant's Burden

Defendant met its burden to provide legitimate, non-discriminatory reasons for the adverse employment actions. *See Hicks*, 593 F.3d at 164.

Put simply, Plaintiff should have expected to work on Jewish holidays, like Purim and Sukkot, as well as the Sabbath. *See* P.S. 3939.07. However, he was granted the Sabbath off each week and was able to request time off through BOP procedures. His routine failure to comply with leave procedures, even after numerous reminders from his supervisors, led to the denial of most, if not all, of his requested days off.

The 2013 schedule was prompted by departmental needs. Plaintiff was assigned to work Sundays because Father Barry gave sermons and chaplains were needed to escort inmates to services. In addition, Warden Ask-Carlson also stated that schedules tended to change every quarter.

The remaining adverse employment actions—Plaintiff's AWOL status and ultimately suspensions, docked pay, limited access to the building, and termination—were prescribed institutional consequences resulting from his own

conduct at work. When Plaintiff was not assigned the schedule he wanted, he simply made his own. Plaintiff was given warnings and reminded of the proper protocols and still failed to comply. According to BOP policies, employees received AWOL status for unexcused absences, and eventually docked pay and suspension. Similarly, his preferential treatment of inmates and unauthorized contact with inmates led to the final investigation, which resulted in his limited access to the building and his eventual termination. Neither Plaintiff's conduct nor the BOP's by-the-book responses are in dispute.

### v. Pretext

Plaintiff cannot establish that retaliation was the "but for" cause of his adverse employment actions. Although "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a *prima facie* case of retaliation," "without more, such temporal proximity is insufficient to satisfy [Plaintiff's] burden to bring forward some evidence of pretext." *Livingston*, 563 F. Supp. 3d at 249–50 (citing *El Sayed* v. *Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010)). Without that presumption, Plaintiff fails to raise a triable issue of fact that Defendant's reasons were merely pretextual. *Id.*

Plaintiff claims the disparate treatment of Imam Musah and Father Barry's use of hostile or contemptuous language demonstrate that Defendant's reasoning is pretextual. But the record does not support those allegations. As stated above, Imam

Musah and Rabbi Ausch are not similarly situated and, therefore, Plaintiff cannot prove disparate treatment. Plaintiff points to communications from December 2012 and January 2013 where Father Barry was "fueled with outrage and contempt," singled out only Purim, assigned Plaintiff a work assignment in a "harassing and retaliatory" manner, and referred to him impolitely. The documents do not support those claims. *See* Ausch Dec., Exs. F, G, & H. They do not contain harassing or discriminatory language or single out Purim or Rabbi Ausch.

Plaintiff also questions the logic of his Sunday work schedule. He claims the departmental needs were pretextual because not all Jewish holidays fell on a Sunday, so he would be missing other Jewish holidays with his new schedule. Yet Plaintiff fails to prove that Sundays were *not* busy days for the department. As a chaplain, Plaintiff was not just responsible for Jewish holidays and events. He was expected to share responsibilities equitably with other chaplains in the department.

Plaintiff's arguments are conclusory and speculative and cannot suffice to demonstrate discriminatory intent. *See Henny v. New York State*, 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012) (citing *Kalsi v. N.Y.C. Transit Auth.,* 62 F.Supp.2d 745, 753 (E.D.N.Y.1998), *aff'd,* 189 F.3d 461 (2d Cir.1999)). For the reasons above, Defendant is granted summary judgment on Plaintiff's claim for retaliation.

### c. Hostile Work Environment

A hostile work environment is one form of disparate treatment on the basis of religion. 42 U.S.C. § 2000e-2(a)(1); *see Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 166 (E.D.N.Y. 2015). "[A] hostile work environment claim analyzes a workplace environment as a whole to discover whether it is abusive." *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001). Where a plaintiff alleges discrimination based on his religion, he or she must show that the alleged hostility or harassment is because of his religion. *Leifer v. New York State Div. of Parole*, 391 F. App'x 32, 26 (2d Cir. 2010).

"[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal citations omitted). A hostile work environment claim requires a plaintiff to show: "(1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

To demonstrate that a workplace has an unlawfully discriminatory atmosphere, a plaintiff must show that both "objective and subjective elements" of

discrimination are met: "[t]he misconduct must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002). The objective prong of the analysis inquires whether "the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000) (quoting *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir.) (emphasis in original), *cert. denied*, 522 U.S. 997 (1997)).

To determine whether a reasonable employee would find his workplace conditions altered for the worse, the court must review "the totality of the circumstances." *Schwapp v. Town of Avon*, 118 F.3d at 111. A plaintiff can set forth a hostile work environment claim by pleading either a single incident of extraordinary severity, "or a series of incidents [that are] sufficiently continuous and concerted to have altered the conditions of [the victim's] working environment." *Id.* (quoting *Whidbee*, 223 F.3d at 69). Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). "No single factor is required" to determine whether a work environment meets these criteria. *Id.* The existence of mere offensive utterances and

isolated incidents of offensive conduct does not make out a Title VII violation. *See id; Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004).

Though Plaintiff has shown that he subjectively perceived the work environment to be abusive, Plaintiff's allegations are neither sufficiently severe nor pervasive to support a finding of hostile work environment by a factfinder.

Though Plaintiff has alleged several comments that can be tied to religion— Father Barry wishing it would rain on Sukkot in September 2012, telling Plaintiff to "loosen up" and referring to his "forgiving god," also in September 2012, as well as Jermaine Wilkins's statement that "just because you practice a religion doesn't mean you own it" in June 2013—these comments are not indicative of a hostile work environment. Rather, they are stray remarks that "do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer* v. *Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998).

To determine whether comments suggest discriminatory bias or are "merely stray remarks," the Court considers: who made the remark; when the remark was made in relation to the employment decision at issue; the content of the remark; and the context in which the remark was made." *Henry* v. *Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 149-50 (2d Cir. 2010). First, the comments are infrequent. Rabbi Ausch points to four or five comments in a nine-month period over the course of his six years of employment. *See Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 455

(S.D.N.Y. 2012) (dismissing claim where plaintiff identified three incidents over a year "in which he was 'chastised' or 'berated' in front of his unit before ultimately being given the time off that he requested."); *Terry v. Ashcroft*, 336 F.3d 128, 149 (2d Cir. 2003) (reversing dismissal where plaintiff was "not complaining merely about sporadic and isolated events, but rather about his daily working conditions.").

Second, though the remarks were made by Plaintiff's supervisors, Plaintiff works as a chaplain in a religious services department, where mention of his religious affiliation is expected, if not inevitable. Several of the comments, though perhaps impolite, were made to reject Plaintiff's protestations about the schedule. *See, e.g.*, *Harvin* v. *Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir. 2019) (summary order) (holding that "[r]un-of-the-mill workplace conflicts, troubling though they may be, do not rise to the level of an objectively hostile workplace," and deeming insufficient allegations that supervisors were "rude and hostile on various occasions," including two occasions where they may have referred to plaintiff's disability).

The remaining comments, including comments made to the volunteer rabbis by Father Barry, are comments about Plaintiff's work performance. *See Salerno* v. *Town of Bedford, NY*, No. 05 Civ. 7293 (SCR), 2008 WL 5101185, at *8 (S.D.N.Y. Dec. 3, 2008) ("Allegations of negative job evaluations or excessive reprimands are insufficient to establish a hostile environment claim."). Father Barry has admitted to

making comments about Rabbi Ausch's work ethic and has stated they were not made on the basis of his faith or traditions. Plaintiff has not presented evidence to suggest otherwise. Similarly, the comment regarding ownership of his religion was part of an email response to Rabbi Ausch in 2013 and relates explicitly to the content of Rabbi Ausch's email. Therefore, the comments were neither sufficiently severe nor pervasive enough to support Plaintiff's hostile work environment claim.

Plaintiff points to Imam Musah's testimony to support a finding of discriminatory intent. But his testimony does not prove any religious motivation, only that Rabbi Ausch was dissatisfied with his treatment at work. Ausch Dec. Ex. E at 6. Imam Musah stated: "I think that the Rabbi thinks that [Barry treated him differently because of his religious beliefs]. I do not have my own feelings. But the way I see I sympathize with him." He was again asked, "Do you think that the issues between Rabbi Ausch and Father Barry were based on religious differences?" and he responded, "I don't know." *Id.*

Because Plaintiff has not raised material issues of fact, Defendant's motion for summary judgment regarding Plaintiff's hostile work environment claim is granted.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

**SO ORDERED.**

_/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
August 3, 2022